JAMES E. STRUTH, appellee, v. COMMUNITY BUILDERS, INC., et al., appellants.

No. 49199.

(Reported in 85 N.W.2d 1)

SEPTEMBER 17, 1957.

Herrick & Langdon, of Des Moines, for appellants.

Duffield, Pinegar & Spencer, of Des Moines, for appellee.

Bliss, J.—Plaintiff alleged in his petition that on May 21, 1956, he was the owner of a dwelling house in Polk County, Iowa, of a fair market value of $500, which on said day, the agents and employees of the corporate defendant, "while acting within the scope of their employment * * * on the orders and at the direction of defendant Robert K. Stout * * * within the scope of his employment as President of the defendant corporation * * * with the aid of a bulldozer maliciously injured, defaced and destroyed said building", and caused it to have no market value. The petition also alleged that when said orders were given by the defendant Stout he knew "that the giving of said orders would and did result in the malicious injury, defacement and destruction of the aforesaid building."

In their answers each defendant denied any malice on the part of either in the destruction of the building.

As shown by the petition, the action is not based on the negligence of defendants, but solely on the alleged malice in their conduct. Since the issue of malice must be determined from the facts as they appear in the record, those pertinent are stated. The appellant Community Builders, Inc., of Des Moines, is an Iowa corporation engaged in building construction. The corporation owns real estate known as 1601 Southwest McKinley, in Des Moines, which it bought from Dan DeHeck for building purposes. On the property were several old buildings, consisting of a farmhouse, a barn, milksheds and other outbuildings, which the corporation resold to Mr. DeHeck for the purpose of disposing of them and clearing the ground. Mr. DeHeck immediately sold all the buildings but the house, and they were promptly salvaged and removed. He had placed an advertisement in a newspaper

1252

for the sale of the buildings. The appellee and his wife saw the ad on April 22, 1956. They had a small one-bedroom house and two children, and desired to add additional bedroom space. The appellee and his wife contacted Mr. DeHeck on April 22 and a verbal agreement was made for the purchase of the house by the appellee for $100, which sum was paid by Mrs. Struth on April 23, 1956, to Mr. DeHeck at his place of employment.

There is disagreement in the testimony of Mr. and Mrs. Struth and that of Mr. and Mrs. DeHeck, who were witnesses for defendants-appellants, as to the time limit for the removal of the house. The DeHecks testified that the Struths "would have two to three weeks to get that house off Community Builders' property." Mr. and Mrs. Struth testified that the time limit was thirty days. They made several trips to the property to dismantle and remove the house but found the entrance doors locked to both the first and the second story. They observed furniture and other articles on the ground floor and they deferred dismantling the house, and made little, if any, effort to get the key to the house. It had been agreed that the appellants were to remove and retain the bathroom fixtures. On May 6 the contents on the first floor were removed by appellants, and on May 13 the second floor was vacated. The appellee began the dismantling of the house as soon as the removal of its contents was begun. He was assisted by some of his relatives.

The following statement is from appellee's brief and argument: "On May 20, 1956, the plaintiff and his father worked all day on the house. They were assisted by plaintiff's wife. That was the last day the plaintiff worked on the house. By the end of May 20, 1956, the plaintiff had the house stripped down to the 2x4s, floor joists, and the flooring which were the parts of the house he intended to use. The house was two stories, 20 by 28 feet, in a general rectangular shape, and the 2x4s were approximately 18 to 20 feet long, placed upright and exposed. They projected about 8 feet above the floor level of the second story. None had been removed. They were about 16 inches apart all the way around the house. The floor joists were 2 inches by 8 inches, about 20 feet long, placed lengthwise, about 16 inches

apart. Nothing was taken from the house between the time the plaintiff left it on the evening of May 20,.1956, and the time it was destroyed. Plaintiff could have completed the dismantling of the house in two and one-half or three more days. He could have done it in less time than that if someone was helping him.

"On May 19, Mrs. Struth talked to Mrs. DeHeck on the phone. Mrs. DeHeck told Mrs. Struth that Stout had said he was going to bulldoze down the house. Mrs. Struth told Mrs. DeHeck that they had been held up because the house was locked for two weeks. Mrs. Struth stated they would need more time * * * 'one more week-end after this one coming up.' Mrs. DeHeck said she would tell Mr. Stout and would call Mrs. Struth and let her know. Mrs. DeHeck never called back. This conversation took place two days before the house was destroyed by the defendants."

Mrs. DeHeck testified that Mr. Stout had never told her he was going to "bulldoze down the house", and that her message to that effect to Mrs. Struth was "just a bluff on her part."

After Mrs. Struth learned of the bulldozing of the house, she called for Mr. Stout, and left word that he call her back, which he did and asked her to meet with him and talk it over and they would settle it. They had the meeting, but no settlement was effected. Mr. Stout told her he thought that plenty of time had been given to remove the house.

There is no controversy over the foregoing factual statements.

The appellee contends that the house was "but a pile of junk" after the bulldozing. It appears from the record that the corporate defendant, through Mr. Stout, arranged with Mr. LeRoy W. Hahn, a road contractor, to remove the partly dismantled house as it was on May 21, to move it out of the way about 150 feet so that the ground could be prepared for the construction of a new building. He was the only witness testifying to what he did. His testimony was not rebutted. As a witness for defendants, he stated:

"Ordinarily we just use one tractor to move a house like that. It was fair sized. One of my operators and myself looked the house over very carefully and decided it would be best by

taking two machines we could put one on one corner of the house and one on the other and move along very carefully. That seemed the proper way to do it. So he operated one machine and I operated another machine. We had them both in low gear, which is the lowest speed we have, travel about a quarter of a mile per hour. We started moving the house. It seemed to be going okay until we got it about half off the foundation, then the foundation collapsed. Of course, when the foundation under the house collapsed, the house also collapsed with it. We stopped immediately because we wanted to try to plan some other way to continue on with it, and we studied it over very carefully. The only thing we could see then was to continue on, going very slowly with two machines. We moved it on around. Of course, as we moved the house a lot of the smaller pieces had fallen down, lath and old shingles. They laid on the ground. The house—walls and stuff, we were very careful of after we moved it a short distance, stopped then and picked up all the salvageable pieces, carried them over to the location where the house was to be placed, then we continued on with the two tractors as slowly as we could. I have had practically 20 years experience as a bulldozer. * * * By having a tractor on each corner, moving along gently, we had every hope and belief in the world we could move that house without damaging it. As I say, when the foundation gave way it left the house—lost its support and it fell down.

"I have no financial interest in the outcome of this controversy. I don't own any stock in the Community Builders. I don't know the plaintiff or Mrs. Struth. I don't have any malice or animosity toward Mr. and Mrs. Struth in any way. We tried, we did everything in our power to move that as gently as we could because I don't want to destroy anything at all, that is why we used two machines. If we wanted to push it over we could have taken one machine and just pushed it over. * * *. [Cross-examination] We had two crawler type tractors. One Allis Chalmers, one a Caterpillar.

"We used the blade part of the tractors to put under the house to lift it up. The blade is in a slightly vertical and horizontal position together, it slants up. The bottom is about a foot forward as compared to the top. The blade itself is 13 feet long and about 3 feet high.

"I took the blade and tucked it under the house to raise it up, get the friction off the ground. A cable control unit on it raises up the blade. We tucked the blade under the house by moving up to the side, moving the foundation in, just pressing the foundation in further so that the blade gets underneath and starts raising up the house and sill. On the other side of the house, at the same time, there was a D-4 Traxivator on one corner, on the west side of the house, and I was on the east corner of the house. I was on the southeast corner and he was on the southwest corner. We were going to push the house north about 150 feet. As we knocked down part of the foundation we would put our blade under there. * * * After we moved it north off the foundation we would gradually turn and go east to the area where we could leave the house. * * * There was a basement under the house, probably three feet, it really wasn't a basement; I would call it just a dugout, about three feet deep on the west side, about four feet deep on the east side. As we moved ahead we pressed the old foundation in, that gave us a footing there so we could travel on, and after we moved a short distance we backed up, took some more dirt and bulldozed it in there so we would have level traveling. We kept dozing dirt in, just moved the house a little at a time until we moved some more dirt in. Then we went back and gently tucked the 13-foot blade in it and moved it a little more. * * * The house was setting on the remaining east side, and that left the house out of shape, settled down in there. * * * The house was about six inches higher than the ground. * * * I think the house must have slipped off the dozer blade, hit the wall and went down in. * * * The house fell off the dozer blade first, slipped down and knocked the foundation down and then—one side went into the basement. Naturally, it tipped over to the one side. * * * The house collapsed. One wall fell out and one wall fell in. Part of the roof was still up there. * * * After we had moved the house about half the distance off the foundation it fell. It did not fall off the machine of the other person working on the bulldozer, my employee, at the same time it fell off mine. It stayed on his. That is what caused it to go sideways. It slipped off my machine. After the house collapsed and fell into the basement hole, we stopped

then and tried to find out what would be the next best move to continue on with it without damaging any of the materials. We took the dozers and moved some more dirt down into the old basement and got the machine underneath the part of it that slipped down there, tried to raise it up, get it out of the basement, to continue onto the place where we were going to put it. As we moved along a little at a time, if any of the pieces fell off we would stop and pick them up so the dozer wouldn't run over them and crush them, move just a few feet at a time, stop and pick up more of the stuff. We tried to save every bit of it. As the house fell it caused a lot of lath and plaster to break up. * * * I and my man both got out there and threw everything out of there, any loose pieces, before we dozed the dirt in there. After the house collapsed, we still moved it in one piece for awhile. The floors were intact yet and the walls rode on the floor as we moved it around, to a certain extent, but then, of course, after we moved it the sides would fall off, whatever was left on the roof would slide off the side because the floor wasn't large enough to carry the house in a down position like that. * * * As we moved it along. We were going as carefully as we could.

"It looked as though it was going to stay intact. As we moved it along it was pretty much of a unit, it was pretty hard to tell whether it was causing any damage or not. After it collapsed we moved it about 125 feet, sliding it along on the first floor. All the small pieces that fell off that we could carry by hand we carried over there and laid in a pile. Large sections that fell off that we couldn't lift or carry by hand we took the dozer and moved them along on the ground. They were too heavy for two men to lift a large section, so we used one bulldozer and slid them along on the ground. We pushed them from the side of the house to the point we piled it as shown on the pictures. * * * I believe we started working on the job shortly after five o'clock in the evening. I think I paid the man who was with me until eight o'clock that night when we finished, until we got everything picked up and piled over there out of the way. * * * If we had wanted to push it over we could have taken one machine and just pushed it over."

Ralph J. Leto, an employee of Community Builders, Inc., had charge of cleaning up and removing all of the material in the partly dismantled house after it was moved by Mr. Hahn. He testified that he had three men pull all of the nails out of the material and stack it.—"In the course of my work, I have complete charge of all materials used for building. From my experience I am able to tell whether or not lumber is usable for building construction. From what I personally saw, I would describe the lumber as all useful, 90% of it was. Mr. Hahn's orders were to move it in one piece. The lumber we piled there included 2x4s and 2x8s. They were from 12 to 18 feet in length. Some were 8-foot studs."

Neither Mr. Leto nor Mr. Stout was present when Mr. Hahn was moving the building. The latter did the work as a subcontractor using his own equipment and employee.

 We have set out all the material evidence pertinent to the issues. There is no material dispute in it nor contradiction of it. It is our judgment that it falls far short of establishing the allegations of plaintiff-appellee's petition of any willful misconduct or malice on the part of the defendant-appellants, or either of them, or of the subcontractor, Hahn, or his employee.

From the evidence and the record the jury could fairly find that the defendants, without the permission of the plaintiff-appellee, were instrumental in the moving and damaging of the latter's building while he was dismantling it.

Section 714.1 of the 1954 Code of Iowa provides that "if any person maliciously injure, deface, or destroy any building", he shall be subject to a specified fine and imprisonment, "and be liable to the party injured in a sum equal to three times the value of the property so destroyed or injured." The petition alleged the malicious destruction of the property and its fair market value to be $500, and prayed for damages against the defendants and each of them in the sum of $1500 with interest at 5% per annum from May 21, 1956. The jury returned a verdict for the amount prayed against defendants and judgment for said amount was entered against both defendants and for costs.

The court instructed the jury that if plaintiff was found entitled to recover they should first determine the amount of

actual damages suffered and in no event to exceed $500, and if they found the act of defendants was maliciously done, they should allow a recovery of three times the actual damages but in no event to exceed $1500.

While the verdict of the jury contained no specific finding of the amount of actual damages, it must be assumed from the verdict of $1500 that the actual damages found were in the amount of $500.

As we have noted the court erred in submitting the issue of malice to the jury. However, it is our conclusion and judgment that the record and evidence do sustain the jury's finding of actual damages in the sum of $500. The judgment is therefore reversed insofar as it is based on malice, as provided in section 714.1 of the 1954 Code of Iowa, and is reduced by $1000, and judgment for plaintiff-appellee in the sum of $500 with interest at the rate of 5% per annum from the 21st day of May, 1956, is affirmed.

Costs are taxed two thirds to appellee and one third to appellants. Affirmed in part and reversed in part.

All JUSTICES concur.